SHIRLEY S. ABRAHAMSON, C.J.
¶ 49. (concurring). This is a mortgage foreclosure case, one of many in Wisconsin and across the country.[1] PHH Mortgage *818 Corporation, which claims to be assignee of the note and the mortgage in the instant case, has been a party in over 2,300 cases filed in the Wisconsin circuit courts, with many cases still open. PHH, and by extension the Mortgage Electronic Recording System (MERS), upon which it relies, represent the modern mortgage system, which has become the subject of frequent litigation in the Great Recession, during which many homeowners have lost the American dream — private home ownership.
¶ 50. Some fear the economic damage from foreclosures; others fear the economic damage from encumbering the mortgage financing industry. MERS benefits its members, but the question remains whether the MERS system provides benefits to home buyers and borrowers and whether MERS has a deleterious effect on real property and mortgage law.
¶ 51. I do not join the majority opinion or support its blanket application of the nineteenth-century doctrine of equitable assignment to the modern mortgage system.
¶ 52. The doctrine of equitable assignment and the longstanding state policy favoring recording of documents affecting real estate are being applied to twenty-first-century transactions that were not imagined when the equitable assignment doctrine and the Wisconsin recording statutes developed. The majority opinion does not attempt to address the practical concerns of the current mortgage foreclosure crisis, the realities of the modern mortgage market, the values of the recording system, or the current and future prob *819 lems associated with the modern mortgage system presented in the instant case.
¶ 53. My concurrence describes the characteristics of traditional and modern real estate mortgages, the doctrine of equitable assignment, the purpose and value of the recording statutes, and unresolved issues raised by the majority opinion's blanket acceptance of the doctrine of equitable assignment and MERS.
I
¶ 54. PHH is just one of a long list of MERS's members.[2] Developed in 1993, MERS is a major player in the modern real estate mortgage system and the secondary mortgage market. MERS is a private, "member-based organization" whose members include "lenders, servicers, sub-servicers, investors, and government institutions."[3] Members pay fees to subscribe to MERS's system of "electronic processing and tracking of ownership and transfers of mortgages."[4]
¶ 55. MERS is the mortgagee of record and, as the majority opinion points out, is strangely also the agent for the entity that ultimately holds the note and mortgage.[5] MERS is presumably both principal and agent, and the entity on whose behalf MERS holds legal title *820 to the mortgage changes every time the promissory note is assigned.[6]
¶ 56. MERS does not have an interest in the promissory notes; it has never had such an interest.[7] Yet sometimes the debtor is advised that MERS does have an interest in the note.[8] Further, MERS does not lend money or collect on the notes secured by mortgages for which it is named as mortgagee.[9]
¶ 57. MERS facilitates transfers of mortgage notes without the necessity of recording an assignment of the mortgage.[10] Members of MERS avoid recording fees because "MERS remains the mortgagee of record" in county recording offices regardless of how many times the note is transferred.[11]
II
¶ 58. The doctrine of equitable assignment is a common-law principle that "a transfer of an obligation secured by a mortgage on property also constitutes a transfer of the mortgage."[12] The idea of equitable as *821 signment is that a mortgage has no significance without reference to the note it secures.
¶ 59. Although the majority opinion concludes "that the doctrine of equitable assignment is alive and well in Wisconsin"[13] "as evidenced by established case law,"[14] its proffered case law does not support its conclusion.
¶ 60. The majority opinion cites no Wisconsin precedent explaining or applying the doctrine of equitable assignment in a case involving real estate in which the note and mortgage were held by two different persons. See majority op., ¶¶ 24-28. The Wisconsin cases upon which the majority relies are not analogous to the instant case.
¶ 61. The Wisconsin cases cited by the majority opinion do not all involve real estate and do not involve instances in which the note and the mortgage are held by different persons. For example, Tidioute Savings Bank v. Libbey addresses the validity of a guaranty to repay a sum of money after the corresponding notes were sold,[15] and Muldowney v. McCoy Hotel Co. concerns the equitable assignment of a chattel mortgage.[16] The majority opinion glosses over the policy concerns unique to real estate transactions, particularly notice, in its use of these cases.
*822 ¶ 62. More importantly, the Wisconsin cases the majority opinion highlights that do address real estate mortgages concern situations in a traditional setting in which the note and the mortgage are held by the same party, as in Tobin v. Tobin,[17] Croft v. Bunster[18] and Carpenter v. Longan.[19] In the instant case, however, the foreclosure proceedings were initiated when the note and the mortgage were separated.
¶ 63. The majority opinion relies on "dicta" in nineteenth- and early-twentieth-century cases (when "dicta" really meant dicta) and applies the dicta to a new set of twenty-first-century facts.
¶ 64. Modern mortgage transactions differ from traditional mortgage transactions. In the traditional, non-MERS mortgage, the homeowner borrows money from a lender-mortgagee. The lender-mortgagee keeps the note and records the mortgage. The lender-mortgagee may transfer both the note and mortgage but generally keeps them together, and the assignment of the mortgage is ordinarily recorded.[20]
¶ 65. In a MERS transaction, MERS is neither the lender nor is it the payee on the promissory note. The borrower executes a note to the lender. The borrower executes the mortgage, however, to MERS. MERS is the holder of the mortgage but not of the promissory note. The mortgage is recorded, with MERS *823 as the mortgagee.[21] Under the traditional view of equitable assignment, naming MERS as the mortgagee separates the mortgage from the promissory note and may cause the note to become unsecured.[22]
¶ 66. The MERS system assists the secondary mortgage market in which mortgages are bought and sold. Many entities may hold a partial interest in the note. Indeed, it is sometimes difficult to track all the assignments of the note.[23] Lenders have been sloppy about keeping track of the promissory notes. In the present case, PHH asserts that it has the note, yet the case is remanded to the circuit court to determine whether PHH actually has the note (and thus the mortgage interest by equitable assignment) entitling it to foreclosure.
¶ 67. The majority opinion ignores the characteristics of the modern real estate mortgage to find a simple solution to the instant case — a solution that creates its own set of problems.
Ill
¶ 68. I turn to the Wisconsin statutes regarding recording of real estate transactions. Wisconsin statutes governing recording of real estate transactions date back to 1849.[24] The recording statutes serve the *824 important purpose of compiling a reliable and public history of title for real estate[25] in order to provide protection, in the form of notice, to all parties involved in the transfer of real estate, that is, the purchasers, sellers, creditors, and debtors.
¶ 69. In the nineteenth century, transfers of real estate rights were expected to be documented at the county recording office,[26] and mortgages were rarely separated from the promissory note.[27]
¶ 70. Today under MERS, MERS remains the mortgagee of record. When MERS members transfer the notes, non-MERS members cannot access the identity of the true owner of a note and mortgage through the public recording system.[28] As Chief Judge Judith Kaye of the New York Court of Appeals has written:
[T]he MERS system, developed as a tool for banks and title companies, does not entirely fit within the purpose of the Recording Act, which was enacted to "protect the *825 rights of innocent purchasers ... without knowledge of prior encumbrances" and to "establish a public record . ..It is the incongruity between the needs of the modern electronic secondary mortgage market and our venerable real property laws regulating the market that frames the issue before us.[29]
¶ 71. The modern mortgage system represented in the instant case by MERS and PHH has increasingly challenged Wisconsin's recording statutes and the state's strong policy in favor of recording all real estate transactions. The recording system fosters disclosure of real estate transactions; MERS fosters secrecy. Under the MERS system, a borrower may access only his or her loan servicer, not the underlying lender.[30] As Chief Judge Kaye has written, this secrecy and avoidance of public recording have undesirable consequences:
The lack of disclosure may create substantial difficulty when a homeowner wishes to negotiate the terms of his or her mortgage or enforce a legal right against the mortgagee and is unable to learn the mortgagee's identity. Public records will no longer contain this information as ... the MERS system will render the public record useless by masking beneficial ownership of mortgages and eliminating records of assignments altogether. Not only will this information deficit detract from the amount of public data accessible for research and monitoring of industry trends, but it may also function, perhaps unintentionally, to insulate a note-holder from liability, mask lender error and hide predatory lending practices.[31]
*826 IV
¶ 72. Mortgage foreclosure actions are frequently before the Wisconsin circuit courts. Numerous issues may arise from the application of the equitable assignment doctrine to the MERS system. Indeed, we do not know the extent of the concerns that will be realized. They are left for another day. Here are a few raised in the case law and the literature:
• Does MERS have standing to bring a foreclosure action?
• Must MERS assign the mortgage to the note owner before a foreclosure action can be initiated?
• What difference does it make that an assignment of the promissory note operates as an equitable rather than legal assignment of the security instrument?
• Can legal and equitable title be separated?
• Must the entity seeking to foreclose have both equitable and legal title?
• What information must be disclosed to the borrower when the mortgage transaction is negotiated?
• What protocols are warranted for dealing with a borrower in financial distress?
• Does the lack of disclosure create difficulty when the homeowner wants to renegotiate the terms of the mortgage or enforce a legal right against the mortgagee and is unable to learn the mortgagee's identity?
• Does the majority opinion preclude federal remedies that are otherwise available to homeowners?
• Are existing rules on negotiable instruments suitable for transfers of mortgages?
*827 • What is the distinction between note ownership and entitlement to enforce a note?
• What is the impact of the comment to Restatement (Third) of Property (Mortgages) § 5.4 cmt a. (1997), which states, "When the right of enforcement of the note and the mortgage are split, the note becomes, as a practical matter, unsecured"?[32]
¶ 73. It seems wise, at a minimum, to call the legislature's attention to the disparity that exists between the recording statute and the modern-day electronic mortgage industry.
¶ 74. Although the outcome in the instant case seems reasonable enough, I cannot join the majority opinion, whose ramifications stretch far beyond this case.
¶ 75. For the foregoing reasons, I write separately.

 After the housing bubble burst, foreclosure filings in Wisconsin "more than doubled from 2005 to 2008." James McNeilly, An Introduction to Mortgage Foreclosure in Wisconsin, Inside Track (State Bar of Wisconsin, Madison, Wis.), Mar. *818 18, 2009, available at http://www.wisbar.org/newspublications/ insidetrack/pages/article. aspx?volume=l&issue=4&articleid= 5513 (last visited June 30, 2014).

 See MERS Member Search, www.mersinc.org/about-us/ member-search (last visited June 30, 2014).

 Shelby D. Green & JoAnn T. Sandifer, MERS Remains Afloat in a Sea of Foreclosures, Prob. & Prop., July/Aug. 2013, at 18, 19.

 MERSCORP, Inc. v. Romaine, 861 N.E.2d 81, 83 (N.Y. 2006).

 Majority op., ¶ 13, n.6.

 Jackson v. Mortgage Elec. Registration Sys., Inc., 770 N.W.2d 487, 503 (Minn. 2009) (Page, J., dissenting).

 Green & Sandifer, supra note 3, at 18, 19.

 See majority op., ¶ 13, n.7.

 Christopher L. Peterson, Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System, 78 U. Cin. L. Rev. 1359, 1377-78 (2010).

 Bank of N.Y. v. Silverberg, 86 A.D.3d 274, 278 (N.Y. App. Div. 2011).

 Id.

 James M. Davis, The Mortgage-Follows-the-Note Rule, Norton Bankr. L. Adviser, Sept. 2013. See also Carpenter v. Longan, 83 U.S. (16 Wall.) 271 (1872); 5 Herbert Thorndike Tiffany, The Law of Real Property § 1449 (3d ed. 1939).
*821 Article 9 of the Uniform Commercial Code, Wis. Stat. § 409.203(7), declares that it codifies the common-law rule of equitable assignment. However, this provision may apply only to personal property. See Uniform Commercial Code Comment 1, Wis. Stat. Ann. § 409.101 (West 2003).

 Majority op., ¶ 23.

 Majority op., ¶ 22.

 Tidioute Sav. Bank v. Libbey, 101 Wis. 193, 197, 77 N.W. 182 (1898) (cited by majority op., ¶ 25).

 Muldowney v. McCoy Hotel Co., 223 Wis. 62, 269 N.W. 655 (1936) (cited by majority op., ¶ 27).

 Tobin v. Tobin, 139 Wis. 494, 498, 121 N.W. 144 (1909) (cited by majority op., ¶ 26).

 Croft v. Bunster, 9 Wis. 503, 506 (1859) (cited by majority op., ¶ 24).

 Carpenter v. Longan, 83 U.S. 271, 272 (1872) (cited by majority op., ¶ 29).

 Adam Leitman Bailey & Dov Treiman, Moving Beyond the Mistakes of MERS to A Secure and Profitable National Title System, Prob. & Prop., July/Aug. 2012, at 40, 41.

 Silverberg, 86 A.D.3d at 278 ("MERS remains the mortgagee of record in local county recording offices regardless of how many times the mortgage is transferred . . ..").

 Restatement (Third) of Property (Mortgages) § 5.4 cmt. a (1997); Christian J. Hansen, Note, Property: Innovations to Historic Legal Traditions — Jackson v. Mortgage Electronic Registration Systems, Inc., 37 Wm. Mitchell L. Rev. 355, 368 (2010).

 See majority op., ¶ 13 n.7.

 Wis. Stat. ch. 59, § 24 (1849) ("Every conveyance of real estate within this state hereafter made, which shall not be *824 recorded as provided by law, shall be void as against any subsequent purchaser in good faith, and for a valuable consideration of the same real estate, or any portion thereof, whose conveyance shall first be duly recorded.").

 Kordecki v. Rizzo, 106 Wis. 2d 713, 718 & n.4, 317 N.W.2d 479 (1982) (citing Thauer v. Smith, 213 Wis. 91, 96, 250 N.W. 842 (1933)).

 W. Scott Van Alstyne, Jr., Land Transfer and Recording in Wisconsin: A Partial History — Part I, 1955 Wis. L. Rev. 44, 44-45 (describing the recording process as expressing "a basic social value" underlying the recording system).

 See, e.g., Carpenter v. Longan, 83 U.S. 271, 272 (1872) ("[T]he note and mortgage" were assigned to the appellant); In re Tobin's Estate, 139 Wis. 494, 498, 121 N.W. 144 (1909) ("[T]he note and the mortgage" were in the name of the same person).

 MERS tracks member-to-member mortgage assignments within its private system, leaving non-MERS members unaware of these assignments. Bank of N.Y. v. Silverberg, 86 A.D.3d 274, 278 (N.Y. App. Div. 2011).

 Romaine, 861 N.E.2d at 86 (Kaye, C. J., dissenting in part) (citations omitted).

 Bailey & Treiman, supra note 20, at 40, 42. ("MERS does not allow nonmembers access to any of its records.").

 Romaine, 861 N.E.2d at 88 (Kaye, C.J., dissenting in part).

 These questions and more are discussed in U.S. Bank National Ass'n v. Ibanez, 941 N.E.2d 40 (Mass. 2011); Silverberg, 86 A.D.3d at 278; Jackson, 770 N.W.2d at 490, 500-02; Shelby D. Green & JoAnn T. Sandifer, MERS Remains Afloat in A Sea of Foreclosures, Prob. & Prop., July/Aug. 2013; Zachary A. Kisber, Reevaluating MERS in the Wake of the Foreclosure Crisis, 42 Real Est. L.J. 183 (2013); Bailey & Treiman, supra note 20, at 40; Christopher L. Peterson, Two Faces: Demystifying the Mortgage Electronic Registration System's Land Title Theory, 53 Wm & Mary L. Rev. Ill (2011).